Good morning everyone. Welcome to the Ninth Circuit. Please be seated. I am Judge Sanchez and with me are Judge McEwen and Judge Pais and we welcome you to the arguments for today. We have one argument that's been submitted, Mejia Garcia v. Bondi, case number 23-3855. And the first case on argument is United States v. Ryan VanDyke, case number 24-2861. And counsel, you may approach. Good morning, Your Honors. Scott Meisler on behalf of the United States. I'll try to reserve two minutes for rebuttal. The District Court held unconstitutional, as applied in this case, a portion of the same federal firearms law that the Supreme Court upheld in Rahimi just last year. We submit here that Rahimi, this court's en banc decision in Duarte, and three recent decisions of sister circuits all demonstrate that the District Court erred in its dismissal order. This court could reach that conclusion applying either of the two historical principles set forth in our brief. The first of those, applied in Rahimi itself, was that legislatures may disarm individuals who present a threat to the physical safety of others. And the second is the principle applied in Duarte, that legislatures may disarm categories of persons that they have found to present a special danger of misuse. I've reversed the order there from the order in our brief, in part because I think the ground I'm leading with here is the narrower ground for decision, and the principle applied in Duarte, I think, is a broader basis for decision by this court. And the other courts of appeals, the Fifth, Sixth, and Tenth Circuits in the recent decisions, have decided the case more narrowly based on the Rahimi principle of a credible threat. I think it's... Sorry. Let me ask you with respect, obviously, Judge Windmill didn't have the benefit of Rahimi. That's correct. But is there any difference, you think, in our analysis in that it's an applied challenge rather than a facial challenge? There is a difference in the sense that as the movement in the District Court, Mr. Van Dyke didn't have to establish that this version of the statute, I'll call that subparagraph C-2, is invalid in all of its applications. But as I understand Judge Windmill's analysis, it would basically exclude all Idaho no-contact orders from the reach of the statute. It would hold the statute unconstitutional as applied to all of them, unless the government could find somewhere else in the record a credible threat finding, an explicit credible threat finding, which Idaho law does not require State judges to make. Can I ask, I wasn't sure if I was reading this correctly from Judge Windmill's order, but did the order essentially say that there needed to be a judicial finding of a credible threat in order to sustain something in alignment with the historical tradition? In other words, even though this is framed as an as-applied challenge, I almost read the order to almost even facial, as if C-2 was facially unconstitutional. I read the order the same way, not that it's necessarily facially unconstitutional. I think Judge Windmill, in footnote 5, if I'm reading the opinion correctly, left open the possibility that if the government could find somewhere else in the record, not in the form, because the form itself that is required by Idaho law for courts to use is not going to contain a credible threat finding. I understood footnote 5 of his opinion to leave open the possibility that we could marshal, for example, a hearing transcript or a recording of the hearing that wasn't available here, where the judge went above and beyond what's required under Idaho law to make the credible threat finding. But in those situations, the government would not be able to use C-1 as the basis for prosecution because the order itself would not contain the finding. And C-1, by its terms, applies to orders. It's talking about the content of orders, of the domestic violence restraining orders. But I agree with Your Honor that his rationale was much broader. The parties here have debated the relevance of facts about Mr. Van Dyke's personal circumstances. I don't understand that to really be the basis for Judge Wendell's decision. It's the basis that is the characteristics of domestic violence restraining orders or no-contact orders under Idaho law and has applied to that class of orders. I think he was finding the statute unconstitutional. Can I just take you to Rahimi for a few seconds? The court was, the chief was pretty careful in distinguishing out 922 G-8 C-1 from C-2. And why do you think he did that? That's a great question, Your Honor. I think C-1 was the easier case for the court. I mean, this is an Eighth Justice majority opinion. They coalesced around that. And if you look at some of the language at the end of Rahimi, the court says they have no trouble concluding. So I think the court found that to be a very easy case and C-2 to be slightly harder. Well, they seem to emphasize the finding of credible threat. I agree, Your Honor. That is the holding of Rahimi. I did write down before argument this morning, I wrote down four spots, though, in the opinion where the court articulated the historical principle that I mentioned at the beginning, individuals who present a credible threat to the physical safety of others. The court wrote that four times in the opinion that I counted without tying it to a judicial finding. So I think you're right that the holding of Rahimi itself involved that kind of a finding. But the court, the historical principle the court recognized there was broader than just the order. So the order here, the no-contact order we're dealing with here, it had the language of C-2, which was if the restraining order prohibits the use, attempted use, or threatened use of physical force. It contains that language, doesn't it? It does. Yes, Your Honor. Is that tantamount of a critical, you know, of a threat? That's the individual poses a threat. That is our submission, and that has been accepted by, again, three courts of appeals to consider this issue since Rahimi. They've relied on the background principle of equity that courts, and I think it's also just a common-sense principle, that a court is not going to enjoin action unless it perceives a real danger that the enjoined person is going to undertake that action. I think that's commonsensical. It's been accepted as a construction of this statute for 25 years. Can I push back on you a little bit, Counsel? Those were all facial challenges, and I do think there is an important distinction between facial and as applied, and so is it your argument that just if any no-contact order just contains the language that is required under C-2, that necessarily means that it's related to dangerousness, and that's good enough? There doesn't need to be any more for an as applied analysis? That is our main submission. I think that's under both this principle and, again, the Duarte analysis about special danger and misuse, but again, the reason I led with this and mentioned it's a narrower ground is you'll notice that in the facial challenges, the decisions that Your Honor mentioned, the courts have left open the possibility that in some unusual circumstance, maybe a defendant could come forward and show that this is the result of a mutual protective order, some other kind of strange failing in the system, and that's the kind of as applied challenges they've left it open for, but those decisions as I read them from your sister circuits do not leave open a challenge based on resisting the background principle, resisting the notion, as Judge Piaz just said, that this kind of determination by a court is tantamount to the kind of credible threat finding the Supreme Court deems sufficient in Rahimi. Let me ask you about the due process aspects of the case, because several times the Supreme Court in Rahimi talks about procedural protections, and of course we typically would analyze those under the 14th Amendment, and we're now on the Second Amendment world. How do you square and how do those two intersect? It's a great question, Your Honor. I think for this court's purposes here, I think you can do exactly what the Supreme Court did in Rahimi in footnote two, which is just to say those aren't presented here. I haven't understood the defendant to raise any due process challenge, and here I think the statute itself bakes in a lot of protections. It requires the kind of orders that are covered or preceded by notice, hearing, and an opportunity to participate in that hearing, so I think the statute itself is going to ensure, basically has guardrails in it not to sweep in state court orders that weren't imposed after procedural protections. This court and many others have rejected the notion that defendants can collaterally attack the state court orders in the federal proceedings. State court doors are open to those challenges, and just one last point before I sit down. I think the cases that we've cited from the Idaho Supreme Court, Lodge and Thompson, show that Idaho courts are open to these challenges, and when Idaho state judges do not follow state law, do not demand that the competent and sufficient evidence that the Supreme Court requires, they reverse those orders, and the State v. Thompson case we've cited in our brief is an example of that. Before you sit down, I'm sure that our presiding judge will give you a little leeway. With reference to Idaho law, we have the Lodge case, of course, which you rest on. It talks in that case about that it must be made to protect the current or future victims, this type of order. Is there a conflict in that Lodge case with the earlier Cobbler case? I don't think so, Your Honor. Cobbler, as I recall, actually reversed an order for being perpetual and not having sufficient findings. There's kind of loose language at the beginning saying that the district court, the state court judge, permissibly entered a broader order without assessing fully the risk, but I don't think that anyone argued in Cobbler that the state court didn't do any risk analysis at all. The issue there was there was a victim. It was obvious that the defendant posed a risk to the victim. The question was, could the court expand that scope to all minors the defendant might have contact with? I think that's also a 2009 decision, and we, since then, in the last five years, have two published decisions from the Idaho Supreme Court, Lodge and Thompson, that clarify the standard and I think construe the statutory duty of the judge in light of the crimes that are enumerated. And the last thing I'll say on this, Your Honor, is just to remind the court that there are domestic civil protection orders under Idaho law. This kind of no-contact order is an order imposed in a criminal case. That means the defendant is charged with or convicted of a crime under Idaho law, and the crimes that are listed in the statute as the principal basis for these orders are all crimes against the person. That's what Lodge holds. That's a helpful distinction. Thank you. Thank you. Sir? I'll give you some extra time. Thank you, Your Honor. So, because this is an as-applied challenge, is it appropriate for us, are we able to look even beyond the circumstances of the Idaho laws themselves to the circumstances of this case? The fact that the defendant here was charged with first-degree stalking meant that he was alleged to have committed this crime while he was under another no-contact order or restraining order, I think a civil one beforehand, that was supposed to last a year. Is that an indicia of dangerousness that would add to the government's argument that, you know, whatever you might have other no-contact orders say in some other case, here, under those circumstances, that lent itself to the notion that there was a credible threat, you know, that the court was concerned with? Yes. I think the short answer is yes. I think you can consider those. You don't have to consider them. But I think you can. And it's also important to recall here that the court, the state court minutes at ER 68 and 69 show us that this, again, the judge was making imposed a no-contact order at an initial appearance on the stalking charge that Your Honor mentioned, and the judge also imposed a no-firearms restriction under state law as a bail condition. So the judge had in mind, even if not directly as part of the no-contact order, the potential that Mr. Van Dyke would have access to firearms and that that would be a danger as well. Does my colleague have any other questions? The firearms restriction was contained in the? The firearms restriction, Your Honor, is on page 69 of the excerpts of Record Volume 1. It's Exhibit 2 to a government filing. It's a paragraph about three-quarters of the way down the page. It starts, Judge Mallard set bond in the amount of $3,000. And it says he isn't, he used to have no firearms in his possession, including his residence, vehicles, sheds, or storage units. Okay. And this was before he was found with a firearm at the courthouse? Is that? Correct, Your Honor. This is October 2022. And the court, the firearm incident to give rise to this federal charge is May of 23. Let me see. Do my colleagues have any other questions? Thank you. Thank you. May it please the court, Sam McCumber on behalf of Mr. Ryan Van Dyke. I'd like to begin with the practical function of Idaho no-contact orders. Because Mr. Van Dyke sent messages and gifts, the state court imposed a no-contact order. And that no-contact order was triggered by statute. That was in the civil? Was that in the... This is the criminal case. The criminal case. Okay. Yes. The civil protection order is not relevant because there was no hearing. It's not eligible for prosecution under C2. And because it was triggered by statute, it's solely the allegations. And that no-contact order in Idaho does not include any finding of dangerousness, any finding of threat, or any factual finding at all. And that's problematic here because the government is trying to disarm Mr. Van Dyke based on a historical analogy of danger without any factual finding of dangerousness. But counsel, I mean, is your argument essentially that C2 should never apply because there isn't a judicial finding of credible threat of danger under C2? Is it your view that that is unconstitutional under the Second Amendment? No. No. And that's why your questions about as applied are relevant here. Because this is about an Idaho no-contact order as applied to Mr. Van Dyke. Mr. Van Dyke's no-contact order did not have any finding of dangerousness, nor any implied finding of dangerousness. So I think that the government's argument about implied findings is wrong on the law because this is statutory criminal law, not civil common law, and implied findings come from civil common law. This is explicit statutory common law. But it's also wrong on the facts. Where here, the state court found no finding of dangerousness for Mr. Van Dyke. Could there... What about the Idaho law coming from Lodge that you don't even, you can't issue these kind of orders unless it's made to protect a current or future victim? I think that when you read Lodge, Matlack, and Thompson together, they all show a broad protection for victims, or alleged victims. But we can offer protections to alleged victims that are different than dangerousness or violence. And I think that that's a decision that Idaho has made, and it's appropriate. The no-contact order here is appropriate. Idaho can protect alleged victims from contact. We want to give these out freely. And our source of truth for that is Judge Windmill. He practiced in Idaho, or has practiced and continues to, for 40 years on the bench. He knows how these no-contact orders work in state court, and he is the source of truth for how these are imposed in state court, not... Well, I have a lot of respect for Judge Windmill, but I don't think we can impute to him the state of truth. And of course, as we know, he didn't really have the benefit of Rahimi. He was operating on Bruin. Correct, Your Honor. He does distinguish Rahimi, even in the hypothetical before it came out. But returning to your question about Lodge, Lodge talks about where the district court appears to include a potential threat. It doesn't have an explicit finding. Same thing with Malak. There's no specific threat of ongoing risk in Malak. And then in Thompson, the court finds that the state court needs to find the subject is a victim. That needs to be explicit, but makes no indication of whether there needs to be a finding of dangerousness. So I think with those three together, you see that Idaho Supreme Court and Court of Justice protections, like you talked about with the government, and with specific protections about identifying the victim, but without any specific factual finding about whether the defendant is dangerous, because there are no contact orders imposed where the defendant is not dangerous. So what are we supposed... So in your view, we just disregard the court's order, the superior court's order, or whatever, the state district court's order? That is, the order says, do not contact or attempt to contact, do not communicate, do not harass, stalk, threaten. So the court said... And that's a valid no contact order. Right. But it doesn't, it's not the finding of dangerousness necessary to make an historical analogy to disarmament. Well, what does harass mean? It's just like Mr. Van Dyke here, where he sent unwanted text messages. Or stalking. And the only reason it's for stalking the first degree is because there was an underlying civil protection order. So here, unwanted attention is not dangerous. Why isn't there an implicit finding or concern about dangerousness if someone has been ordered to have no contact with the victim, and then violates that order, and that's what results in the stalking charge of first degree. So you have a pattern of this, of ignoring those orders over some period of time. Why isn't that, in the context of what the no contact order is meant to do, sufficient here? Because the conduct is not dangerous. It's harassment, it's messages, it's not assault. So perhaps there's an underlying allegation like assault that would trigger a finding of dangerousness with the same form, but that's not what happened here for Mr. Van Dyke. And that's why, that's important, because that's the, it's a different how and why than from... Isn't it a bit of a narrow view though? So unless someone has committed assault on a victim, there's no danger to their possession of a firearm if they continue to make contact with that person, with the same person each time, despite a court ordering them to stay away. Why would the historical tradition say that's not enough? Because the state court could have made that finding and did not, and the government could have chose a different analogy, but did not. They leaned on dangerousness. And here this conduct is not dangerous. Let me just ask you another. Is the stocking charge a felony? For Mr. Van Dyke? Yes. Because of the underlying civil protection order. Doesn't that require, at some point along the way, there was a probable cause determination that he was committed a stocking charge? Yes. So why doesn't that provide the basis? Because that's not the disarmament, right? He's charged because of this no contact order, not because of the underlying felony. Right. You know, you talk about historic tradition, you look back to, I was somewhat taken by the Supreme Court's language in Hays, which is not that long ago, maybe 15 years ago, and said firearms and domestic strife are a potentially deadly combination. And of course, studies have borne that out. Cases have borne that out. And why is not that most obvious connection sufficient? Because a order preventing contact between acrimonious domestic partners is not the same as a credible threat of illegal behavior. We do not equate firearm possession with dangerousness, particularly in Idaho, where the Second Amendment is second nature. Almost 60% of Idahoans own a firearm. There's no demonstrated threat here, merely a warning not to do so. But it arises in the context of a stocking charge. Correct. Right? And the narrow constitutional floor here is that there must be some finding of dangerousness for Mr. Van Dyck, and there wasn't one. Well, what about the government's categorical argument? There is also a historical tradition of disarming vagrants, and those intoxicated, Duarte talks about that, Perez-Garcia talks about some of that. And here, why isn't it sufficient for the Idaho legislature to have determined on a temporary basis that if someone is subject to a domestic restraining order, that they should not be allowed to have a firearm for that duration, after a court has made an individualized finding that it's appropriate to do so in that case, even without a finding of a credible threat? Why isn't that categorically enough to align with a historical tradition? Then it's a level of generality question, where there is a category of folks who can be disarmed because they're dangerousness, and Mr. Van Dyck does not fit into that category of dangerous people. And I think you mentioned some historical analogs. I think surety is a very important one, because surety from Rahimi requires a probable ground to suspect a future misbehavior, and here there's no probable ground of misbehavior with firearms. It's just about the texting and the gifts. So you have to, unwanted attention does not rise to that level of dangerousness. I'd like to briefly distinguish Gordon Combs and Perez-Gallon. All three of those are facial challenges. All three of those apply law where the underlying court finds a serious threat. For example, in Gordon, the Utah law has an extra finding to disarm, where the state court must find that there's a serious threat. And all three of them leaves open as applied challenges without a disarmament finding. And that's what's happening here. Mr. Van Dyck is that exception that those three cases leave open. And this court can decide Mr. Van Dyck's as applied challenge without a circuit split with those decisions. But can I ask just one follow-up related to that? I think I started out with the government about this distinction between the as applied and the facial. But with respect to Rahimi's how and why dichotomy that is discussed, is that altered in an as applied challenge? Is that how and why? Yes, because, for example, the why here for Mr. Van Dyck is that it's wise to give a cooling off space in no contact order. And the cooling off space is different than dangerousness. I see him over time. Unless the court has any questions, I ask that the court affirm. Thank you. Thank you. Why don't we give you a couple minutes? Okay. Thank you, Your Honor. I'll try to be brief. Starting picking up off the how and why, I don't think they're different, Your Honor. And again, relying on the sister circuit decisions, they basically have reason. They're the same in all the respects that matter to the Supreme Court. We're talking about temporary disarmament. Disarmament only of a narrow swath of the population, not the general population. The same why your sister circuits have held, because it's to mitigate a threat of domestic threats inherent in domestic violence. And the only difference, as we mentioned, is the verbiage of the letter. I think you would be, sorry, the verbiage of the order, I think you would be creating a circuit split because I think you would have to reject the equitable principle we've been talking about that inherent in the decision to impose a restriction on the use of force is a finding that the defendant risks using force against the victim. So I think that is critical, central to the analysis of your sister circuits. I think you would be creating a split on that. Pivoting to Judge Sanchez's question to counsel about the broader principle, again, we've been focusing on Rahimi, but the broader principle from Duarte, I think equally would allow the statute to be applied constitutionally here. In fact, it's a broader principle, because I think what Duarte holds is that no individualized dangerousness determination is required at all. So whereas your sister circuits have left open the possibility of as-applied challenges, as my colleague mentioned, I don't think those would be available at all under application of Duarte, just as they're not available in this circuit for felons who want to claim, like Mr. Range, that they personally are not violent or dangerous. And again, that principle is not dangerousness per se. It's special danger of misusing firearms. But it's sweeping a little broadly, don't you think? What if a state order is one of these dual no-contact ones that Judge Ho mentioned in his Rahimi decision? And let's say it doesn't involve an enumeration of violence against a victim, but let's say theft or something pretty milquetoast. Would you still rely on the notion of injunctive relief as a basis to say that it should be  I think we would, but I think that's where the two principles I mentioned maybe lead to different results. One is that if you apply the Duarte or Perez-Garcia principle about special danger of misuse, I don't think it leads to a... But we're talking there about convicted felons at that point, as opposed to someone charged with something. That's true. But again, if you're doing the how and why, I think there's also just a temporary disarmament, whereas it's permanent in the context of felons or misdemeanor or crime of domestic violence defendants, like the ones Judge McEwen mentioned in the Hayes case. But I do think that those lead to potentially different results in those situations, whereas the mutual protective order scenario, you could consider as an as-applied under the credible threat rationale. I'm not sure that Duarte rationale would leave that open. I should say that I don't think the mutual protective order thing is really a possibility under the Idaho regime that we've been discussing, as I think my colleague acknowledged. That's a criminal case. You can't have someone come in, a plaintiff, a victim come in and say, I want one of these and the defendant to say, well, I want one too. That can't happen in the Idaho criminal case. So again, if you're thinking about as-applied, that concern does not arise in a subset of  I think that's an open question. What does it take to prove up a felony stalking case in Idaho Superior – in Idaho State Court? I think it's the basic elements of stalking, which I don't have on my fingertip, Your Honor, plus an aggravating circumstance, which I think in these kind of cases, as Judge Sanchez mentioned, oftentimes involve violation of a previous protective order or stalking that occurs while the defendant is on probation for a prior stalking offense. But that doesn't seem to be alleged in the complaint. That the defendant engaged in that conduct? Yeah. I take your point, Your Honor. Is that part of the statutory? I would think so. I don't have – I think the – It was alleged in ER 52, 052. I'm at the wrong page. Right. I think we did – I think Mr. McComber did include some of the underlying charging documents – Okay. – from the case. I don't have that on my fingertips. Because, you know, what it alleges is that there was stalking, seriously alarmed, annoyed, or harassed, causing substantial emotional distress to the victim to wit by sending text messages to and or by receiving gifts to family members. But because it's alleged to be first-degree stalking, Your Honor, I think it has to have one of those aggravators –  – aggravators that we know from other information in the ER, including, I think, volume three, the sealed volume we submitted to the court.  I'll look at it. We know that information. We know it to be basically a recurrence of prior stalking. Okay. Thank you. That helps.  Thank you, Your Honors. Thank you. Thank you both for your helpful arguments. The matter will stand submitted.
judges: McKEOWN, PAEZ, SANCHEZ